PINCHBECK *v.* BALTIMORE TANK LINES, INC., ET AL.

[No. 363, September Term, 1969.]

*Decided May 12, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Jay S. Bernstein* for appellant.

*William A. Ehrmantraut,* with whom were *Edward C. Donahue* and *James P. Gleason* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

The appellees urge us to sustain the finding of the trial judge, Bowie, J., that the appellant, plaintiff below (Pinchbeck), although the favored driver on a boulevard, was guilty of contributory negligence as a matter of law. While we have not yet gone that far, in the past we have recognized the possibility that the circumstances of some future case might require such a holding. *Brown v. Ellis,* 236 Md. 487 (1964) ; *Simco Sales v. Schweigman,* 237 Md. 180, 187 (1964) ; *Nicholson v. Page,* 255 Md. 659, 665 (1969). We think the circumstances in the case before us do require such a holding. In our narration of these circumstances we shall, of course, be at all times mindful of the familiar rule that the evidence and all logical and reasonable inferences deducible therefrom must be considered in a light most favorable to Pinchbeck. *Ackerhalt v. Hanline Bros.,* 253 Md. 13 (1969).

The boulevard we shall be concerned with is that part of Indian Head Highway (the highway) running south from the Capital Beltway in Prince George's County. It is generally parallel to and a mile or so east of the Potomac River. The two northbound lanes are separated from the two southbound lanes by a grassed median strip. The intersecting road (the intersection), the scene of the accident, is known as Palmer Road to the east; to the west it is called Livingston Road. Traffic entering the highway from either direction is controlled by a stop sign. The highway is level and visibility is unimpaired both to the north and to the south of the intersection.

On 14 December 1967, at about 12:30 a.m., the appellee, John David Burns (Burns), arrived at the stop sign controlling eastbound traffic about to enter the highway from Livingston Road. He was driving a 1966 Mack double-axle tractor to which was attached an 8600 gallon fuel trailer. The overall length of the rig was 55 feet. Since he had just made his last delivery the trailer was empty and in that condition it weighs about 10 tons. He said there were five lights across the top of the cab in front; on the after end of the trailer there were two tail lights, two combination stop and turn lights, a light on each corner, two reflectors on the bumper and three lights across the top.

At the same time Officer Schmidt, a Prince George's County policeman of three and a half years' service, was sitting in his patrol car talking to a fellow officer in a parking area about "a quarter to a half mile south" of the intersection. He was facing the highway. The night was clear; the roads were dry. The posted speed limit for northbound vehicles was 60 miles per hour but, he said, at a point about 300 feet from the intersection the posted limit was reduced to 45 miles per hour. "There are also signs [he added] further back down the road [reading] 'Reduce Speed'."

While Officer Schmidt and his confrere were chatting by the side of the highway Lawrence Wallace (Wallace) and his wife were approaching the intersection from the

north, at "approximately 45, 50 miles per hour," in their 1966 Ford pick-up truck. He was "on the way home from work." A former member of the (Washington) Metropolitan Police Department, he had "handled accidents and chased the fast ones * * * in a scout car" for 17 years. He now travels this portion of the highway "every day twice a day, sometimes four times a day."

Pinchbeck, then 25 years old, a carpenter and a drywall mechanic, did not work on 13 December 1967. He said he "got out of bed about seven." After a little breakfast at the motel where he was staying he talked with his foreman for a while. Later he went with some fellow workmen to their job site to dry out clothes and tools. He had a "couple of drinks" (whiskey and Coca Cola) around noon. They returned to the motel around 3 o'clock. He had some sandwiches with two ladies who lived at the motel "just after 6 o'clock." From 6 o'clock until 11:30 he "stayed up there in the room [with the two ladies] watching television." He left them to get a "glass of beer" shortly after 11:30. About ten minutes later he met up with Herman Jones whose "wife had just left him and [as a result] he was pretty depressed." He wanted to talk to Pinchbeck about it. "Herman wanted to ride. He wanted [Pinchbeck] to drive his car to ride some so [they] could talk." Pinchbeck suggested they "go get something to eat." Donald Locklear, who had joined them, proposed "going to Maryland." They set out in Herman's new 1968 Plymouth Barracuda with Pinchbeck driving, Donald beside him and Herman in the rear. They stopped first at a tavern called Marg's Restaurant, a mile or so from the Beltway on the Virginia side. From Marg's they crossed the Potomac into Maryland, looking for a "crab house." Leaving the Capital Beltway they drove south to Sunnybrook Tavern which is on the west side of the highway at the intersection. They turned into the Sunnybrook parking lot but for some reason or other they left immediately and continued south on the highway. Thereupon Donald suggested, according to Pinchbeck, that they "turn around and go back" to Sunnybrook.

Pinchbeck said "Okay" and that is "the last thing [he] remember[s]."

Officer Schmidt "noticed the '68 Barracuda southbound on * * * [the] highway at a high rate of speed." When it came by him its speed was "in the neighborhood of 70 to 80 miles per hour." He testified that "[i]t continued south on * * * [the] highway to the next intersection south of Palmer Road, which is Old Fort Road. At that point it slowed and made a U turn and came back up north on * * * [the] highway * * * toward the position * * * [he] was parked at." His estimate of its speed as it passed by him the second time was "in the vicinity of 80 miles per hour." The spot in the parking lot where he was parked was "approximately a half mile south of the intersection." He said to the officer sitting beside him, "[I] had better go get that guy before he has an accident up the road." He "took off out of the parking lot * * * to try to intercept the vehicle."

Wallace saw Burns pull up to the stop sign as he (Wallace) approached the intersection. He saw no traffic in the northbound lane but he "saw some red tail lights on [his] side" going away from him. He saw Burns enter the intersection. After the trailer passed in front of him he saw, for the first time, Pinchbeck "coming north on * * * [the] highway at a high rate of speed," which he estimated to be "approximately 80 miles per hour." As he crossed the intersection he said to his wife, "Oh, my God, he's going to hit him." And at that moment "he [Pinchbeck] went into a skid." He saw Pinchbeck hit the rear end of the trailer and "burst into flames." He turned into the median strip, ran to the Barracuda, "put the fire out and pulled one man out of the car, and just at that time a police cruiser pulled up and called for help."

Officer Schmidt arrived at the scene just after the collision. He got Pinchbeck, Herman and Donald off to the hospital. Herman and Donald were dead on arrival. He found skid marks "145 feet from the beginning to the point of impact." The rear wheels and springs of the trailer were "broken loose." The rear carriage was

"slanted toward the right of the vehicle." The cost of repairing the damage was about $2500. The point of impact, he testified, was five feet north of the intersection. The photographs taken at the scene show that the Barracuda was demolished. Indeed, to say it was pulverized would be forgivable hyperbole.

While Pinchbeck's amnesia dates from the moment he made the U turn and started north on the highway he did not deny Officer Schmidt's testimony that his speed was "70 to 80 miles per hour" during his progress south from the intersection to Old Fort Road. Nor can we escape the necessity of accepting the fact that his northward progress was "in the vicinity of 80 miles per hour." He exceeded the posted limit of 60 miles per hour; he ignored the signs commanding a reduction in speed; he grossly exceeded the 45 mile limit. He admitted, although he does not remember, that he "must have seen the truck." However, his admission has little significance since he would not in any event be heard to deny it. The truck was huge; it was moving; it showed a number of lights; the reflectors on the rear bumper were quite large. It was further illuminated by the "well-lit" Sunnybrook Tavern and as well by the lights of Wallace's pick-up truck which shone upon it during its traverse of the southbound lane. There was nothing in the northbound lane of the highway between Old Fort Road and the intersection to obscure his vision. Curiously the record provides no answer to the question why Pinchbeck failed to slow down enough to negotiate a left turn at the intersection. If, as he said, it was their intention to return to Sunnybrook, that is where he would have turned. Nor is there anything which might explain why he failed to use the escape route provided by the median strip. To avoid the trailer all he had to do was to turn left on to the grass.

As indicated early on we are fully persuaded that Judge Bowie was not in error when he directed a verdict for the appellees. And it must not be supposed that we are at all unaware of the caveat recently restated by Judge

Barnes, for the Court, in *Plitt v. Greenberg,* 242 Md. 359, 367-68 (1966):

> "There must be a rational basis for adjudication, and a jury will not be permitted to infer from mere possibilities the existence of facts. *Shafer v. State, for use of Sundergill,* 171 Md. 506, 189 Atl. 273 (1937). However, this Court has always maintained that if there be any legally relevant and competent evidence, *however slight,* from which a rational mind could infer a fact in issue, then a trial court has invaded the province of the jury by declaring a directed verdict. *Geschwendt v. Yoe,* 174 Md. 374, 381, 198 Atl. 720 (1938); *Hanrahan v. Baltimore,* 114 Md. 517, 535, 80 Atl. 312 (1911) and prior Maryland cases cited therein. Judge Horney, for the Court, in *Smack v. Jackson,* 238 Md. 35, 37, 207 A. 2d 511 (1965) stated the rule succinctly when he said: '[A] party is not entitled to a directed verdict in his favor unless the facts and circumstances are such as to permit of only one inference with regard to the issue presented.' "

We have looked long and hard at the uncontradicted and uncontroverted evidence in this record and giving Pinchbeck all the best of it we cannot see how a rational mind could harbor any inference but that he was negligent.

*Judgment affirmed.*
*Costs to be paid by the appellant.*